IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 4, 2017 Session

**STATE OF TENNESSEE v. HEATH BELL**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01286     Lee V. Coffee, Judge**

---

**No. W2016-00136-CCA-R3-CD**

---

The Defendant, Heath Bell, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and first degree felony murder. The trial court merged the convictions and sentenced the Defendant to life imprisonment. The Defendant raises the following five issues on appeal: (1) whether the trial court erred by denying his motion to suppress tainted eyewitness identification testimony; (2) whether his due process rights were violated by the State's withholding of exculpatory evidence of a possible third party perpetrator; (3) whether the trial court erred by not granting his request for a new trial based on the newly discovered exculpatory evidence; (4) whether the evidence was sufficient to establish his identity as one of the perpetrators; and (5) whether the trial court erred by limiting his closing argument. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Monica A. Timmerman (on appeal) and Michael E. Burton (at trial), Memphis, Tennessee, for the appellant, Heath Bell.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Samuel D. Winnig, Tracye N. Jones, and Colin A. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On the night of February 15, 2013, the victim, Joe Howell, was shot to death in his newly leased Hyundai Trailblazer in the parking lot of the Pendleton Place Apartments in Memphis. Fifteen hundred dollars in cash, which the victim earlier had on his person, was missing when his body was discovered in his vehicle. Kayla Jennings and her boyfriend, James Edwards, identified the Defendant and his co-defendant, Nicholas Augustus, as two men with guns they had seen acting in a suspicious manner in the area shortly before the shooting. In addition, Chamere Talley, the sister of the victim's girlfriend, informed the police that she looked out her apartment after hearing gunshots and saw the Defendant and a second man in dreadlocks running near the victim's crashed vehicle. Ballistics evidence revealed that two different guns were fired at the victim and that shots entered from both the driver's and the passenger's side of the vehicle. Although the Defendant claimed to have been with his girlfriend in East Memphis at the time, cell phone records revealed that phone calls were made and received by his cell phone in the area of the shooting around the time the victim was shot. The Shelby County Grand Jury subsequently indicted the Defendant and Mr. Augustus with the first degree premeditated murder and first degree felony murder of the victim and the employment of a firearm during the commission of a dangerous felony. The men were tried together before a Shelby County Criminal Court jury, which found the Defendant guilty of both murder counts and Mr. Augustus not guilty of both counts. The trial court dismissed the firearm charge, merged the Defendant's murder convictions, and sentenced him to life imprisonment.

## Suppression Hearing

Prior to trial, the Defendant filed a motion to suppress the eyewitness identification of Ms. Jennings, arguing that any courtroom identification made by her would be impermissibly tainted because she had been present at earlier court hearings in which the Defendant was dressed in prison attire and addressed by name by the trial judge. The Defendant asserted that such a procedure was "at best, equal to, and at worst, far more suggestive, than a 'show-up identification.'"

At the May 1, 2015 suppression hearing, held out of the presence of the Defendant and Mr. Augustus, Ms. Jennings testified that on the night the victim was shot she was walking across the street toward her apartment complex with her then-boyfriend, James Edwards, when he pushed her in the back several times and said, "Don't you see them n****s over there? They look like they fixing to do something." When she looked in the direction he indicated, she saw two men with guns standing at the corner of an apartment

-2-

building.    Frightened, she and Mr. Edwards hurried home to her apartment. Approximately five to ten minutes later, they saw that "the apartment complex was full" of police cars and ambulances.

Ms. Jennings testified she had never seen the two gunmen before that night and did not provide any descriptions of them to the police.  However, she accompanied Mr. Edwards, who was subpoenaed as a witness, to the preliminary hearing held approximately one month after the shooting, and immediately recognized the Defendant and Mr. Augustus when they entered the courtroom as the two armed men she had seen that night.  She was seated in one of the last rows of the courtroom and recognized the men before their names were called or they were otherwise identified.  She also recognized the men as the gunmen during a March 23, 2015 court hearing in the case in which the trial court threatened to put her in jail because she had an outstanding warrant. During that latter hearing, the trial judge had her sit in one of the "jail chairs" approximately ten feet from the Defendant and Mr. Augustus.  She was seated in the courtroom for approximately three minutes before the judge called her to come up to the microphone, and she was seated in one of the "jail chairs" in the same row as the men for two to three minutes.  No one pointed out the men to her at either court hearing, and she was not influenced in her recognition of them by Mr. Edwards' identifications.  Instead, she immediately recognized them at both hearings based on their "facial structures" from having seen them on the night of the shooting.  She estimated that she was less than half a football field's length from the Defendant and Mr. Augustus at the time she saw them standing at the corner of the apartment building.

Ms. Jennings recalled that one of the two men was an inch or an inch and a half taller than the other one and had a lighter complexion.  She also recalled that the taller, lighter-skinned man was wearing a red jacket.  She could not, however, relate any specific facial features or hairstyles of either man.  Nevertheless, she testified that she would be able to recognize both men from their facial structures if she saw them again.

At the conclusion of the hearing, the trial court overruled the motion to suppress the identifications, accrediting Ms. Jennings' testimony that she immediately recognized the Defendant and his co-defendant when they entered the courtroom at the preliminary hearing and that her identifications were based on her experience the night of the shooting rather than any outside influences.  The court also found that the circumstances under which the original viewing occurred rendered her identification reliable.

## Trial

### State's Proof

At trial, the victim's wife, Juwana Howell, testified that she last saw the victim alive at approximately 6:00 p.m. on February 14, 2013, when he left alone in his just-leased Hyundai Trailblazer with approximately $1500 in cash in his pocket.

Terrence Harrold testified that at approximately 10:20 p.m. on February 15, 2013, he was leaving the Pendleton Place Apartments with friends when he saw a SUV in the bushes that appeared to have been in an accident. The vehicle was still running, and a nonresponsive man was slumped over the steering wheel. Before the police arrived, Mr. Harrold saw a woman approach the passenger's side of the vehicle, open the door, reach in, and turn the ignition off before leaving the scene.

Officer Hal Owens of the Memphis Police Department testified that Mr. Harrold flagged him down to report a wrecked vehicle in the bushes at the Pendleton Place Apartments. The first officer to arrive, he secured the scene until other officers responded. To the best of his memory, both the glove box and the console of the vehicle were open when he arrived.

Officer James P. Smith, a crime scene officer with the Memphis Police Department, identified various photographs of the crime scene as well as five spent shell casings -- two 9-millimeter and three 40-caliber -- that were recovered from the scene. The vehicle's glove box, console, and hatchback were all open when he arrived, and no money was recovered from the victim's body or the vehicle.

James Edwards testified that in February 2013 he lived with Kayla Jennings in the Kimball Cabana Apartments next-door to the Pendleton Place Apartments. He knew both the Defendant, who went by the nickname "Bean,"[1] and Mr. Augustus from the neighborhood. On the afternoon of February 15, 2013, he saw the Defendant at about 5:00 p.m. when he was returning from a store. At about 10:00 or 10:30 p.m. that same day, he and Ms. Jennings were walking back together from another trip to the store when he noticed the Defendant and Mr. Augustus standing by the corner of the Pendleton Place Apartments. He first recognized the Defendant because he was wearing the same clothes he had on earlier in the day. The area was well-lit by street lights, and Mr. Edwards was able to see that Mr. Augustus was standing with the Defendant. Both men had guns in their hands and appeared to be "up to something."

Mr. Edwards testified that he feared the men were about to "come at [him]," so he pushed Ms. Jennings in the back and instructed her to quicken her pace. As he and Ms.

---

[1] Mr. Edwards said he did not know how to spell the nickname, but he would spell it as it sounded to him as "B-e-a-n." Elsewhere in the trial transcript, the Defendant's nickname is spelled as "Bing."

Jennings hurried home, he kept watching the Defendant and Mr. Augustus through the fence "trying to make sure they didn't shoot through the fence or [anything]." No more than fifteen or twenty minutes after he and Ms. Jennings reached home, he looked out the door to see the lights of emergency vehicles in the apartment complex. Mr. Edwards acknowledged that he and Ms. Jennings had been drinking and smoking marijuana that day but said he was not "too intoxicated" and was aware of his surroundings at the time he saw and recognized the Defendant and Mr. Augustus.

Mr. Edwards testified that he did not want to get involved in the case, but police detectives obtained his telephone number and called him. He first met with a detective at a neighborhood pizza restaurant, where he told the detective that he wanted "to leave [Ms. Jennings] out of it" because he did not "know what they would try to do to her or her kids." He later went to 201 Poplar, where he positively identified the Defendant and Mr. Augustus from photographic spreadsheets as the gunmen he had seen that night. Mr. Edwards identified the photographic spreadsheets, which were admitted as exhibits and published to the jury. He testified that he received $1000 for a CrimeStoppers' tip he reported, but that was the only money he received in connection with the case. He was subpoenaed to appear as a witness and was not being paid anything for his court testimony.

On cross-examination Mr. Edwards acknowledged that he and Ms. Jennings had been drinking alcohol and smoking marijuana throughout the day on February 15, 2013, as they celebrated his recent graduation from Vatterott College. He testified that he identified the Defendant from the photographic lineup he was shown by police on February 19 and identified Mr. Augustus from another photographic lineup on February 25, 2013. On February 26, he gave his formal written statement to police about what he had witnessed. He acknowledged he was incorrect in his preliminary hearing testimony that the Defendant and Mr. Augustus were within twenty-five feet of him when he saw them and that they were probably further away. He was adamant, however, that he was certain in his identifications.

Mr. Edwards could not recall having said in the preliminary hearing that Mr. Augustus was trying to cover his face and could not with certainty recall that detail at the time of trial. What he was certain of was that both men were armed with guns and that both were acting in a suspicious manner as if "fixing to get ready to do something[.]" He acknowledged that his clear view of the men lasted only approximately two seconds as he walked from the middle of the street toward his apartment complex. He also acknowledged that there was a six-foot wooden privacy fence between the apartment complexes. He insisted, however, that he was able to watch the men through the numerous broken and missing boards of the privacy fence as he and Ms. Jennings continued to their apartment. He reiterated that he first recognized the Defendant, who

was wearing a red coat, by his clothing, and he acknowledged that he had seen him "many times" in the past wearing a red coat.

In response to questions from the jury, Mr. Edwards testified that he reported the CrimeStoppers' tip after the detective informed him he could receive money for providing a tip about the crime. He did not call CrimeStoppers before he met with the police because he "wasn't in it for the money" and knew nothing about the possibility of being paid until the detective told him about it.

Kayla Jennings reiterated her preliminary hearing testimony about how she saw the armed men standing at the corner of the Pendleton Place Apartments after Mr. Edwards pointed them out to her, how she was frightened and hurried home, and how she saw the emergency lights in the Pendleton Place Apartment parking lot approximately ten minutes after they reached her apartment. She testified she had never seen the men before that night, had not wanted to become involved in the case, and had not talked to any lawyers or investigators about it until 2015, when she started receiving subpoenas. She indicated that Mr. Edwards had not wanted to be involved either, testifying that he "got a warrant" because he had not wanted to go to the preliminary hearing. She said she accompanied him when he went to the preliminary hearing and was present in the courtroom when he identified the Defendant and Mr. Augustus. She made a positive courtroom identification of both the Defendant and Mr. Augustus as the gunmen she had seen that night and testified that she had not received any CrimeStoppers' cash in the case.

On cross-examination, Ms. Jennings acknowledged that she was intoxicated at the time she saw the men. She testified that the men were standing in a dark corner and that she saw them for only about two seconds before they were blocked from her view by the wooden privacy fence. She said she accompanied Mr. Edwards at each of his meetings with the police but never told the officers that she had seen the men. She agreed that the only description she was able to provide of the men at an earlier court proceeding was that one was slightly taller than the other and had lighter skin. When asked to turn her face to the wall and provide a description of the Defendant and his co-defendant without looking at them in the courtroom, she was unable to do so. Nonetheless, she insisted that she had immediately recognized the men when they entered the courtroom at the preliminary hearing.

Dominique Talley, the victim's girlfriend, testified that the victim, who was driving a new vehicle, dropped her off on February 15, 2013, at the back side of the Pendleton Place Apartments, where her sister, Chamere Talley, lived. She explained that the victim dropped her off there instead of her own home because she had another boyfriend and the victim was married, and they were therefore "creeping," or "sneaking

-6-

off," to see each other. Approximately thirty minutes after she entered the apartment, she heard gunshots. A little later, she heard a commotion outside, went out, and saw a number of people, including police officers, gathered around the victim's wrecked vehicle.

The witness could not recall having told a police officer during an interview the day after the shooting that she had turned off the victim's vehicle but had not removed anything from it. She insisted, in fact, that it could not be true because she had not gotten that close to the vehicle. She said she did not check on the victim and could not recall any particulars about the condition of the vehicle, other than that it was wrecked.

Chamere Talley testified that she knew the Defendant, who was one of her neighbors at the Pendleton Place Apartments, by the nickname "Bing." She had also seen the co-defendant, Mr. Augustus, who lived "down the walk," but she did not know him. She testified she did not know who was responsible for the victim's death, had not seen anyone around the area on the night he was killed, and did not see the Defendant that day. She acknowledged, however, that she signed a February 18, 2013 statement to the police in which she said that she had seen the Defendant and a second man in dreadlocks running from the direction of the victim's rolling vehicle immediately after she heard gunshots. She insisted that the statement was coerced and fabricated by the police, who, she claimed, kept her handcuffed to a chair for three or four hours, cursed her, and threatened to charge her with murder and remove her three children from her custody.

The witness testified that she made up the descriptions she provided to the police of the perpetrators. She stated that she and the Defendant had never been romantically involved and she had no idea how the police came up with the portion of her statement in which she allegedly said they had been dating. She testified she made up the portion of her statement about the Defendant's having talked about his "Ruger." Later in her direct examination testimony, however, she claimed that the police fabricated that portion of the statement. She said the portion of her statement was true in which she said she heard approximately eight gunshots about ten or fifteen minutes after her sister arrived at her apartment and told her that she had just been dropped off by the victim, who had gone around the corner to "serve someone."

On cross-examination, the witness testified that she had also repudiated the statement at the preliminary hearing, held only a few weeks after she signed her statement. She said on the day of her statement, the police arrested her at her workplace, placed her in handcuffs, brought her to an interview room, handcuffed her to the table, and interrogated her for hours, calling her a "f***ing liar" when she denied any knowledge of the crime. According to her testimony, it was only after the officers

-7-

threatened to take her children from her and charge her with first degree murder that she signed the statement.

On redirect examination, the witness denied that she was afraid she would be charged with murder because she knew she had informed the Defendant in a telephone call on the day of the victim's murder that the victim had money on him. On recross-examination, she agreed that there was nothing in her statement to police about her having informed the Defendant that the victim was carrying cash.

Detective Fausto Frias of the Memphis Police Department's Homicide Bureau testified that when Mr. Edwards first met with him at the restaurant to relate what he had witnessed, he was accompanied by a woman. He acknowledged that Mr. Edwards asked that his girlfriend be "left out of it" in exchange for his coming forward and that he agreed to try to honor that request.

Detective Frias testified that he and Sergeant Brown interviewed Chamere Talley on February 18, 2013, which resulted in her signed statement. He said she did not appear to be under the influence of alcohol or narcotics, exhibited no difficulty in reading her advice of rights form, and initialed and signed the advice of rights form and her statement. The interview took place at the homicide office. She was not in custody at the time the interview began but was handcuffed and taken into custody when it became clear that she had lied about her contacts with the Defendant. Detective Frias explained that "discrepancies" in a prior interview with other investigators led to the February 18 interview, during which he asked if there was anything in her telephone that could be considered evidence in the murder investigation. She answered "No, no, here," handing him her phone. As he was looking through it, he asked if she knew the Defendant, and she replied that she did not. He then asked her why the Defendant's phone number was in her phone. In response, she broke down crying, repeatedly said that she did not want to die, and expressed fear for the safety of herself and her children. Detective Frias said it was at that point that he had her "shackled" by handcuffing one of her ankles to the chair in which she was sitting.

Detective Frias testified that he read Ms. Chamere Talley the advice of rights form and that she signed it at 3:59 p.m. She signed her completed statement at 6:52 p.m. In the interim between the signed waiver of rights and the signed statement, officers gave her water, let her calm down, dealt with other matters, and returned periodically to the interview room, where she provided pieces of information that they verified before continuing with the interview. She never asked for a lawyer. Detective Frias acknowledged that he and Sergeant Brown may have screamed obscenities at her during the interview process because she was, in their opinion, being untruthful. He denied that he threatened to lock up Ms. Talley for first degree murder or to take her children from

-8-

her. Detective Frias did, however, tell her that she could be locked up for giving a false statement to a police officer and could be charged with murder if they discovered "that she had any involvement in [the] murder[.]" He also asked her who would care for her children if she went to jail.

Detective Frias read Ms. Chamere Talley's statement aloud, in which she identified the Defendant as the man she had been dating for two months and whom she saw running near the victim's vehicle immediately after she heard gunshots. Detective Frias said that the words in the statement were entirely Ms. Talley's and that no one told her what to say. The portion of the statement in which she was asked to describe what occurred reads as follows:

> My sister knocked on the door around 10:15, and I opened it to let her in, and I asked her how did she get to my house. She said [the victim] dropped her off, and he was going around the corner to serve someone. About ten to fifteen minutes passed, and I started to hear gunshots. It was about eight in all.

> My mother and my nine-year-old son and my nephew and my sister were in the house. My sister started putting everybody on the floor, and I went to the door to look. The shooting was over, and I looked out the door, and I saw [the Defendant] and another dude running [from] the direction of . . . a gray truck past the dumpster. I recognized [the Defendant] from the side of his face and the cap he had on because I saw him with that cap on before.

> I didn't know, but later on, I found out that that was [the victim's] truck – that that was [the victim] in the truck.

Detective Frias testified that during a February 25, 2013 interview with the Defendant, the Defendant denied any involvement in the murder and claimed to have been at his girlfriend's East Memphis apartment at the time. The Defendant also denied talking to Mr. Augustus on the phone that day, either before or after the shooting. Mr. Augustus informed Detective Frias during a February 26, 2013 interview that he had heard the gunshots and run to see what was happening and that his fingerprints would be found on the victim's vehicle because he had touched the driver's door. In response to a juror question, Detective Frias testified that he understood Ms. Chamere Talley's expression that the victim was going to "serve someone" to mean that the victim was going to make a drug sale.

On cross-examination, Detective Frias testified that when it became clear to him that Ms. Chamere Talley was lying during her interview, he raised his voice to her and said, "I can't believe you're going to sit here and lie for this mother f*****." He acknowledged that she described the second suspect as having dreadlocks and that Mr. Augustus did not have dreadlocks when he interviewed him on February 26, 2013.

Memphis Police Officer Jonas Holguin testified that he took the Defendant into custody on February 25, 2013, at his girlfriend's apartment, which was located near Mount Moriah and Kirby in East Memphis.

The parties stipulated that a 9-1-1 call about the shooting was received at 10:23 p.m. on February 15, 2013.

Michael Tycer, an employee of Cricket/AT&T, identified various documents that were admitted into evidence, including a record of the Defendant's cell phone calls, the company's "call towers," and the "coverage maps" of those towers. According to those records and Mr. Tycer's testimony, several calls were made and/or received between the Defendant and Ms. Chamere Talley and the Defendant and Mr. Augustus on February 15, 2013, including a 9:44 p.m. call with Ms. Talley, a 10:28 p.m. call with Ms. Talley, and a 10:36 p.m. call with Mr. Augustus. Based on the location of the tower used for those calls, in an area near the shooting, Mr. Tycer estimated that the odds the Defendant's cell phone was located at the East Memphis apartment of the Defendant's girlfriend at the time the calls were made were "infinitesimal[ly] small." The records also showed that a number of phone calls were exchanged between the Defendant and Ms. Chamere Talley and the Defendant and Mr. Augustus on the day after the murder took place.

Memphis Police Officer Charles Cathey, the crime scene investigator who processed the victim's vehicle, testified that the vehicle's glove box and console were open, no money was found in the vehicle, and no usable fingerprints were recovered. He also identified photographs that showed that bullets were fired into the vehicle on both the driver's and passenger's side.

Tennessee Bureau of Investigation Agent Eric Warren, who analyzed the shell casings and bullet fragments submitted for analysis in the case, testified that the two 9-millimeter shell casings were fired from the same 9-millimeter weapon and the three 40-caliber shell casings were fired from the same 40-caliber weapon.

Dr. Marco Ross, the Shelby County Deputy Chief Medical Examiner who performed the autopsy of the victim's body, testified that the victim had four entrance gunshot wounds, including a fatal wound to the left chest that pierced his heart.

## Co-Defendant Augustus' Proof

Dejuano Echols testified that Mr. Augustus, who had a "low haircut" at the time, was with him at a Pendleton Place apartment on the night of February 15, 2013, when they both heard gunshots. On cross-examination, he acknowledged he told police that he had gone alone to get some food and saw the police cars in the parking lot when he returned. He explained that he lied to the police because he realized they suspected Mr. Augustus of murder, and he did not want to be associated with the case.

Jennifer Hoff, a private investigator, testified that she measured the distance from the middle of the street, where Mr. Edwards and Ms. Smith saw the gunmen, to where they reported the gunmen were standing and found it to be approximately 175 to 185 feet.

## Defendant's Proof

The Defendant elected not to testify and presented no evidence in his defense.

## Co-Defendant Augustus' Additional Proof

Dr. Jeffrey Neuschatz, an expert in eyewitness identification, testified that beyond eighty feet, it becomes "very, very difficult" for anyone to accurately identify a face due to the inability to distinguish detail. According to his testimony, other factors that tend to reduce the accuracy of an identification, which were present in this case, included whether the witness was in a "high stress" situation, whether a weapon was involved, the amount of time the witness was exposed to the individual, whether the individual's head or face was covered, and whether the viewing occurred when it was dark. He also described "clothing bias" as the tendency of an eyewitness who was unable to get a good look at an individual's face to be misled into an identification based on clothing, especially if the clothing is generic. On cross-examination, he agreed that an eyewitness's familiarity with an individual would make it easier for him or her to make a positive identification of that individual.

## State's Rebuttal Proof

Sergeant Brad Webb of the Memphis Police Department testified that Dejuano Echols told him that when he returned to the Pendleton Place Apartments after going out for food on the night of the shooting, police cars and ambulances were in the parking lot, and that he later learned a homicide had taken place. He said Mr. Echols mentioned nothing to him about having been with Mr. Augustus that day.

## ANALYSIS

### I. Denial of Motion to Suppress Identification Testimony

The Defendant contends that the trial court erred by denying his motion to suppress the eyewitness identification testimony of Kayla Jennings, arguing that it was impermissibly tainted by her presence at court hearings at which the Defendant was dressed in jail attire and addressed by name by the trial court. The Defendant argues that Ms. Jennings' "identification of the Defendant for the first time" at the hearing on the motion to suppress "was the equivalent of a showup identification." The State responds by arguing, among other things: that Ms. Jennings' identification of the Defendant at the preliminary hearing was not a "showup procedure" because it was accidental, was not orchestrated by the State, and involved no improper State action; that her identification testimony was reliable and shown to have an independent basis apart from her viewing at the preliminary hearing; and that any error in admitting her testimony was harmless in light of Mr. Edwards' strong identification testimony.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). In Neil v. Biggers, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Id. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (internal quotations omitted); see also Stovall v. Denno,

388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

In denying the Defendant's motion to suppress, the court, among other things, accredited Ms. Jennings' testimony that her identifications were not influenced by Mr. Edwards or by having seen the Defendant and Mr. Augustus in the courtroom but were based on her personal experience on the night of the shooting. The court found that Ms. Jennings' viewing of the men at the preliminary hearing was not a "showup" and was not arranged by the State. The court went on to conclude that the two "inadvertent instances" in which she had been exposed to the men in the courtroom did not impermissibly taint the identification process, finding, under the Biggers factors, that Ms. Jennings had ample opportunity to view the gunmen, who were less than fifty yards from her in a well-lit area; that her attention was very concentrated on them during that time because they were armed and she was fearful; that her failure to provide a prior description of the gunmen was the fault of the police department for not interviewing her; that she had made no earlier erroneous identifications of the gunmen; that she expressed certainty in her identifications; and that her original recognition of the gunmen at the preliminary hearing occurred within a relatively short time of when she viewed them on the night of the shooting. Based on the totality of the circumstances, the court overruled the motion to suppress the identification testimony.

We can find no error in the trial court's ruling. As the court noted, Ms. Jennings was unequivocal in her testimony that she immediately recognized the Defendant and his co-defendant when they first entered the courtroom at the preliminary hearing, and before they were identified or addressed by name. She was also unequivocal that her identifications had not been influenced by Mr. Edwards or anyone else in the courtroom.

Although she was unable to describe their facial features at the hearing on the motion to suppress, she was also unable to describe them when they had just been before her in the courtroom during her trial testimony, indicating that she is, perhaps, simply not adept at providing descriptive details. However, she was adamant at both the suppression hearing and at trial that she recognized the men from having seen their faces on the night of the shooting. The ability to recognize someone, and the ability to provide a verbal description of that individual, are two different things. We conclude, therefore, that the trial court properly denied the Defendant's motion to suppress Ms. Jennings' identification.

## II. Alleged Newly Discovered Exculpatory Evidence

In interrelated issues, the Defendant contends that his due process rights were violated by the State's withholding of exculpatory evidence of a possible third party perpetrator and that the trial court erred in denying his motion for a new trial based on such newly discovered evidence. The State argues that the trial court properly denied the motion for a new trial based on the alleged exculpatory evidence, which consisted of the fact that the victim was murdered three days before he was to testify for the State in an attempted murder trial, because the Defendant's general sessions attorney was aware of the information, the information was publically available, and the information was irrelevant to the Defendant's trial, except to the extent that it invited speculation. The State further argues that there was no due process violation because the prosecution did not withhold the evidence from the Defendant and that the evidence was "only marginally exculpatory, if it was exculpatory at all." We agree with the State.

The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004); Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Brady, however, does not require the State to investigate for the defendant, see State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984), and the State's duty to disclose does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable

probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). "Materiality" has been further explained as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worth of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

When seeking a new trial based on newly discovered evidence, a defendant must show that neither he or she nor counsel had knowledge of the evidence prior to trial and that he or she and counsel exercised reasonable diligence in attempting to discover it during the trial, that the evidence is material, and that the evidence would likely change the result of the trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Whether to grant a new trial based on newly discovered evidence rests within the sound discretion of the trial court. Id.

At the hearing on the motion for new trial, Muriel Malone testified she was the lead prosecutor for a case in which Curtis Johnson was indicted for the February 18, 2012 attempted first degree murder, employment of a firearm during the commission of a felony, and aggravated robbery of the victim in the case at bar, Joe Howell. She said both the victim and his wife were witnesses in the case, which had a scheduled trial date of February 18, 2013. After she learned of the victim's murder, the case was continued to April. The victim's wife testified for the State at the trial, which resulted in a not guilty verdict for Mr. Johnson. Ms. Malone believed she discussed with Mrs. Howell whether or not the victim's murder could have been related to the victim's scheduled testimony in Mr. Johnson's trial, and she recalled that she definitely discussed with the prosecutor in the case at bar the fact that they both had cases in which Joe Howell was the victim. She could not recall if Mr. Johnson was out on bond at the time of the victim's murder, but the trial court observed that the records indicated he was.

On cross-examination, Ms. Malone acknowledged that the original and superseding indictments in Mr. Johnson's case were public records and that the preliminary hearing and trial were open to the public. On redirect examination, she

conceded that one would have to know that Mr. Johnson was a defendant to search for the indictments and other information about his case. In response to questioning by the trial court, she testified that nothing in her investigation led her to believe that the two cases were related and that she would have asked to be involved in the victim's murder case had she believed there was any connection between the two cases. On redirect examination, she testified that she could not recall if the police investigated whether Mr. Johnson had any involvement in the victim's murder. She reiterated, however, that she had no information linking Mr. Johnson to the victim's murder case.

Attorney Justin Gee, who had represented the victim in a drug case a number of years earlier, testified that he represented the victim and the victim's wife in connection with Mr. Johnson's case after they failed to respond to a subpoena and material witness warrants were issued for them. To him, the fact that the victim was murdered a few days before he was scheduled to testify in a case in which he was the "prime victim" was a "red flag," indicating there may have been a connection between the two cases. On September 22, 2015, Mr. Gee and the Defendant's attorney, who were friends, were exchanging "war stories" about their respective cases when he realized that the victim in the Defendant's case was Joe Howell, who had been the victim in Mr. Johnson's case. At the time, he could not recall Mr. Johnson's name, but he informed the Defendant's counsel that Mr. Johnson's attorney in that case was Art Horne.

On cross-examination, Mr. Gee conceded that in the course of representing a criminal defendant, he would routinely investigate the background and any criminal history of the victim. On redirect examination, he testified that he had been surprised to learn that the Defendant's counsel did not already know that the victim in the Defendant's case had been the victim in another case and scheduled shortly to testify in that other case. On recross examination, Mr. Gee testified he learned at some point that Mr. Johnson's attorney, Arthur Horne, had represented the Defendant in the case at bar when it was still in general sessions court.

The Defendant testified that he did not know Curtis Johnson, was not and had never been a member of the Vice Lords gang, and was not a member of any gang.[2] Attorney Arthur Horne, who represented the Defendant in general sessions court, never informed him that he represented another individual who had been charged with the attempted murder of the victim. The Defendant said that, had he been aware of that fact, he would have informed his current trial counsel.

---

[2] Among the exhibits the Defendant attached to his Amended Motion for New Trial was an affidavit attached to the indictment returned against Curtis Johnson, which indicated that Mr. Johnson shot the victim after the victim had won a large sum of cash from Mr. Johnson and Mr. Johnson's Vice Lord associates while gambling.

At the conclusion of the hearing, the trial court found that the information about the victim in the Defendant's case having been a victim and scheduled to testify in another case was publically available, was not in the State's exclusive possession, and should have been discovered by a defense investigator conducting a routine investigation. The court, thus, found no discovery violation by the State. The court characterized the connection the Defendant was attempting to make between his case and Mr. Johnson's case as a "quantum leap" and noted that it would not have allowed the evidence at trial, had defense counsel asked for it, on the grounds that it was irrelevant and that any probative value it could possibly have was substantially outweighed by the danger of unfair prejudice and confusing the jury. The court concluded that the information was not "newly discovered evidence that would have probably made a difference in [the] trial."

We find no error in the trial court's ruling. The Defendant has failed to establish that the State suppressed the information, that the information was favorable to the defense, or that the information was material. As the trial court noted, the victim in this case was, unfortunately, the victim of two separate violent crimes, but there was nothing in the record to indicate that the crimes were related. There was also nothing in the record to establish that the prosecution was in possession of any information suggesting a link between the two crimes. There is, however, evidence that the Defendant's original, general sessions counsel coincidentally represented Mr. Johnson in an attempted murder case, which involved the same victim in the Defendant's case. The fact that he, apparently, did not point this out to the Defendant's successive counsel suggests that it did not appear to be relevant or noteworthy to him. We conclude, therefore, that the Defendant is not entitled to relief on the basis of this issue.

### III.  Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction, arguing, specifically, that the proof was not strong enough to establish his identity. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by

the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant asserts that his co-defendant was acquitted on "nearly identical" proof, with the only differences being the recanted identification statement of Ms. Chamere Talley and the alibi witness for Mr. Augustus, who was shown to have lied to the police. The Defendant argues that the fact that his cell phone may have been used in the area of the shooting "does not indicate that [he] committed [the] murder." He also questions the weight and credibility of the testimony of Mr. Edwards and Ms. Jennings, both of whom were admittedly intoxicated when they saw the Defendant "acting suspicious[ly]" in the area before the shooting. The State disputes the Defendant's characterization of the evidence against him and his co-defendant as being "nearly identical," pointing out that proof was presented that the co-defendant did not match the dreadlocked appearance of the second man seen running near the victim's vehicle and that he, unlike the Defendant, provided an alibi witness. The State further argues that the proof was more than sufficient to sustain the Defendant's conviction. We agree with the State.

Both Mr. Edwards and Ms. Jennings positively identified the Defendant as one of the two gunmen they had seen lurking in the area immediately before the shooting, and Ms. Chamere Talley gave a statement to police identifying the Defendant as one of two men she saw "running [from] the direction" of the victim's crashed vehicle immediately after she heard gunshots. Both Mr. Edwards and Ms. Chamere Talley were familiar with the Defendant and, therefore, presumably able to more easily recognize him than someone unacquainted with him. In addition, despite the Defendant's claim to have been in a completely different area of the city, his cell phone was active in the area around the

time of the shooting. In sum, the evidence was more than sufficient for the jury to find that the Defendant was one of the two armed men who shot and killed the victim and robbed him of his cash. We conclude, therefore, that the evidence is sufficient to sustain the Defendant's conviction.

## IV. Limiting of Closing Argument

The Defendant contends that the trial court erred by unreasonably limiting his closing argument, which prevented defense counsel from "cover[ing] the portions of his argument dealing with jury instructions, admissions against interest, identity, and burden of proof." The State argues that the trial court properly exercised its discretion to prevent defense counsel from "rambl[ing] on indefinitely." We, again, agree with the State.

Although "closing arguments are a valuable privilege that should not be unduly restricted," and attorneys are given great leeway in arguing their positions, the trial court has "significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). The record reflects that the trial court interrupted defense counsel with the instruction to "start wrapping up your argument" only after counsel had been talking for a considerable length of time. At the hearing on the motion for new trial, the trial court observed that, according to its notes, the State's closing argument for both defendants, including rebuttal argument, took approximately fifty minutes, the co-defendant's closing argument took fifty minutes, and the Defendant's argument had gone on for an hour at the time that the court instructed counsel to start wrapping it up. The court also observed for the record that, at the conclusion of the trial, one of the jurors made the "gratuitous statement" that the arguments were too long and the jurors did not know how much longer they "could have actually sat there," had the court not stepped in to instruct counsel to start wrapping up his argument.

In light of the record, we can find no abuse of discretion in the trial court's having limited the Defendant's closing argument to a reasonable length of time. Accordingly, we conclude that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-19-